UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

CASE NO.: 19-CR-00076-MCR

UNITED STATES OF AMERICA

vs.

ANDREW E. FISHER

Defendant.
_____/

## MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS 1-2

Defendant, ANDREW E. FISHER (FISHER) through undersigned counsel and pursuant to Federal Rules of Criminal Procedure 29(a) moves this court for a judgment of acquittal on Counts 1-2.

Under Rule 29(a), a defendant is entitled to a judgment of acquittal when "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a) (discussing standard for acquittal before submission to the jury). The court must "determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *U.S. v. Grigsby*, 111 F.3d 806, 833 (11th Cir. 1997)(quotation marks omitted) (reversing conviction on appeal finding that jury verdict was contrary to evidence).

## **No Evidence that Fisher Joined Burton's Ongoing Conspiracy with Hodgson**

In this trial, the Government has not introduced any evidence that Mr. Fisher knew about and willfully joined the Burton-Hodgson- Marie Smith scheme to defraud alleged in Count 1 of the Indictment.

There is not a single email, of all the emails seen by the jury, wherein Mr. Fisher is cc'd as a participant or Vicky Cowart, or any other employee, is cc'd as a participant with both Brad Hodgson **and** Scott Burton.

There is not a single email, of all the emails, showing that Scott Burton told Mr. Fisher or anyone else at PSP that he and Brad Hodgson had begun perpetrating a scheme to defraud Tricare in late November of 2013, 11 months before Mr. Burton ever met Mr. Fisher.

The evidence has also shown that Brad Hodgson never met Mr. Fisher. Indeed, Mr. Hodgson could not even identify Mr. Fisher in the courtroom for the jury.

The evidence has shown that Mr. Burton barely knew Mr. Fisher and they met on a mere two occasions in or around October of 2014. The evidence also showed that Mr. Burton was a seasoned sales representative with a group of specialized and impressive surgeons in Atlanta.

The evidence also demonstrated, very importantly, that Mr. Burton deceived and defrauded his good friends, Marc O'Connor and Patrick Dunham at Curant Health. The evidence illustrated that Mr. Burton profited handsomely for this arrangement earning $8 Million dollars over a 16-month period (FR5c) and earning more than $3.4 Million dollars alone in 2014 which was deposited into his savings account. *Id.* Notably, Mr. Burton also tricked Mr. Dunham in an email in August of 2014 (AF-237) wherein Mr. Burton lied to Mr. Dunham about the validity of the prescriptions he was sending over for "out of state patients." Mr. Hodgson testified that the patients at that time were not real Traub patients. Yet, on cross-examination, told the jurors that those patients were real and that Dr. Traub was being "harassed." Day 2, Burton, 242:1-2.

Arguably the most important testimony from Mr. Burton for purposes of this Motion is Burton's testimony about what he allegedly told Mr. Fisher.

> I told him -- he asked me why we weren't using the other pharmacy, and I said, we had a doctor, Dr. Traub, who was prescribing these pain and scar creams to ***patients that were friends of mine or my representatives or relatives that needed these pain and scar creams that were out of state***; and that Dr. Traub didn't actually see the patients. ***And I said, Dr. Traub was okay with this, because, as Dr. Traub said, this isn't OxyContin; this is a pain -- topical pain and scar cream, it's not a big deal, I have been prescribing to friends and family for years. So, I told Andrew Fisher that; and I said, look, is this going to be a problem at your pharmacy? He said, as long as it's not a problem with the surgeon, I have no problem with it.***

See Day 2, testimony of Scott Burton, 116:10-23.

Putting aside the fact that this statement should not be given any weight because fraudsters like Burton do not immediately reveal their scheme to strangers the very first time they speak on the phone or meet in person, this testimony, viewed in the light most favorable to the Government, does not place Mr. Fisher on notice of any criminal conduct.

At best, the statement places Mr. Fisher on notice of an issue that Mr. Burton had at the former pharmacy related to some of Dr. Traub's prescriptions. In the same breath, Mr. Burton supposedly told Mr. Fisher that ***Dr. Traub is prescribing these medications. Dr Traub has been prescribing these medications for years to friends and family***. *Id.* at 116:10-23.

Burton never advised Mr. Fisher that Dr. Traub had not consulted with these patients or communicated with these patients. To further persuade Mr. Fisher that such practices were legitimate, Mr. Burton added that Dr. Traub had advised that "Dr. Traub was okay with this" because these were topical creams, and not opioids (which are controlled substances). *Id.*

At trial the Government introduced no evidence or testimony addressing what constitutes a valid doctor patient relationship. Instead, through Tracy Coufal, the Government introduced evidence that Tricare would not pay for compounded medications if they knew a licensed practitioner had not made a determination as to the medical necessity of the

compound. Mrs. Coufalt further testified that Tricare would not have paid for a compound medication when the medication was not prescribed by an authorized Tricare provider.[1]

None of this testimony, however unbelievable it may seem to the defense, addresses the situation posed by Mr. Burton's testimony. Mr. Burton testified that he told Mr. Fisher that Dr. Traub *prescribed* these compounded medications. He never said – Brad Hodgson is forging the prescriptions; he never said the patient and Dr. Traub have never communicated with the patient about his or her symptoms. And, there is no testimony on the record that Tricare *would not* have paid for these claims under these circumstances – the circumstances under which a doctor prescribes a compounded medication

---

[1] Q. Ms. Coufal, if TRICARE knew that a licensed practitioner had never made a determination that a compounded drug prescription was *medically necessary for the beneficiary*, would TRICARE have paid a claim for that prescription?
A. No.
Q. Why not?
A. A condition of coverage is that all prescriptions, all medical services in general, under TRICARE, need to be medically necessary.
Q. And under that sort of baseline requirement, who needs to make the *determination of medical necessity*?
A. It needs to be a physician or other authorized TRICARE -- other authorized provider recognized by the TRICARE program.
Q. Had TRICARE known that a claim for a compounded drug *prescription had not actually been prescribed by a licensed practitioner authorized by TRICARE*, would TRICARE have paid that claim?
A: No.

Day 4, Coufal, 158:8-24.

but does not physically see the patient. In fact, Mr. Burton's testimony does not address with respect to what he told Mr. Fisher is that his friends "needed" the medications which is inconsistent with an absence of medical necessity for the patients.

For this reason alone, it is entirely unclear how Mr. Fisher was placed on notice that Dr. Traub's prescribing for certain patients was an unlawful practice and that such conversation is evidence of Mr. Fisher joining a scheme to defraud Tricare.

Equally unclear is whether, based on Burton's alleged statement to Mr. Fisher, Burton had placed Mr. Fisher on notice that there was no valid doctor patient relationship between the doctor who was purportedly prescribing these medications and these patients.

Mr. Burton and Mr. Hodgson also provided testimony that appears to substantially contradict one another further demonstrating Mr. Fisher's lack of guilt.

Mr. Burton for example testified that he believed, as late as November of 2015, that Dr. Traub had signed the doctor patient letter, the 90-day supply letter, and the formula change authorization letter. Burton believed that Traub had signed each letter. Nevertheless, Hodgson testified that he forged the signature for each of those letters.

Lastly, Mr. Fisher and PSP did not offer special treatment to Mr. Burton. He was paid the same commission percentage, his doctors had to follow the same fill process, and verification process, and Mr. Burton's attempts to ship patients out of state were declined at least twice (PSP-1 no patients shipped and Joy Lail no prescription filled in South Carolina).

### Other Evidence of Supposed "Grey Area" Practices at PSP

The remaining evidence in this case which purports to demonstrate that there were practices at PSP which were in the "grey area" again do not demonstrate a willful scheme to defraud Tricare. Mr. Fisher is not on trial for grey areas or supposed bad practices at his pharmacy.

### Copay Collection

Mr. McKnight testified that PSP "attempted" to collect but they did not have a collection procedure or policy. Indeed, Mr. McKnight testified:

> Q. Do you recall there being sort of a specific policy with reducing co-pays in certain instances?
> A. I wouldn't -- I don't necessarily recall a policy.
> Q. Or common practice?
> A. ***I don't recall specifically lowering co-pays. Mostly what I'm aware of, you know, we just would not pursue collecting them, if they weren't paid.***

DAY 3, 124: 20-24, 125:1

Again, there is no evidence in the record that a failure to ultimately collect a copay is contrary to any law.

In addition, as Steven Burklow and Kate Deckelbaum from ESI testified, the provisions in the ESI Manual related to the "Network Provider." PSP was never a Network Provider. In addition, the Central Fill Agreement executed by Glenn Hansen and Mr. Burklow (AF 74 and 74a) between Mr. Burklow's pharmacy and PSP obligated Mr. Burklow to collect copays. And, there was no evidence that Burklow, not PSP, failed to collect any co-pays.

In addition to the above, it was abundantly clear from the testimony at trial that Burklow, as the network provider, and not PSP, had the obligation to collect these copays:

> **Q:** Mr. Burklow, do you remember you had been asked a couple
> of questions about co-pay collections at Burklow Pharmacy?
> A. Yes.
> Q. And, again, you were the ESI provider at that time, correct?
> A. Yes.
> Q. Pursuant to your provider network agreement. And as part of that agreement, you're obligated to follow the ESI manual, correct?
> A. Yes
> Q. Do you know whose obligation, pursuant to the ESI manual, it is to collect co-pays?
> A. The network provider.
> Q. Who is the network provider?
> A. Burklow Pharmacy.

Day 3, 72:1-15.

Kate Deckelbaum from ESI provided similar testimony:

>Okay. But the ESI manual provision dealing with co-pays and co-pay collections, that relates directly to the network provider, right?
>A. That's correct.
>***Q. That obligation is on the pharmacy that has a contract, direct contract, for example, with ESI, right?***
>***A. Yes, sir.***

DAY 3, 101-102:1-5.

Lastly Glenn Hansen testified that the CFA obligated Burklow to collect the copay.

### **Manipulation of Formulas/Ingredients**

The evidence has shown that the pharmacists at PSP were heavily involved in the development of the Rx pads, that they were involved in developing formulas, and that Mr. Fisher relied on his pharmacists to develop formulas. The evidence has also shown that some of the formulas were developed, in part, to increase PSP's profit margin but, like any business, PSP was attempting to generate revenue. Nevertheless, there was also testimony that the pharmacy eliminated the use of flurbiprofen and other ingredients that would have increased revenue for the pharmacy, at a loss to the pharmacy. And, ultimately, it was the doctor's decision whether he or she wanted to prescribe the compounded medication to a specific patient.

### **Shipping out of State**

There was evidence at trial that PSP had shipped out of state to a select few patients for Dr. Traub's office. Nonetheless, there was additional evidence that PSP

did not fill certain Traub prescriptions (PSP-1) and there was additional evidence that PSP had already shipped prescriptions, for several physicians, to patients in Alabama prior to meeting Mr. Burton and after meeting Mr. Burton. Accordingly, this may be evidence of a bad pharmacy practice, but it is not evidence of any specific intent to join Mr. Burton's fraud scheme. Concerning those out of state patients there was no evidence that there was no doctor patient relationship. For example, Tyler Einarson (AF-251), spoke to the employees at PSP and advised that he wanted the medication. He also verified his shipping address with PSP. AF-251.

Cary McKnight also testified that the issue of shipping out of state was raised with the pharmacists:

> Q. Do you recall generally there being issues with that, having patients in states that you were not licensed in?
>
> A. I ran in -- I had a lot of issues getting some states licensing. Some were just slower than others. And so there were some states that we had doctors wanting to use us, patients in those states, ***but we didn't have the ability to ship into those states. There was talk about some -- by the pharmacist and some that they could ship to a neighboring state that we might have been licensed into, if the patient had an alternative address at that location***.

Day 3, 121: 11-20.

The pharmacists were involved in this process and they had a duty, a legal obligation, to ensure that prescriptions that were suspicious or "unfillable" were not filled. Tom Wiley and Glenn Hanson and Mary Crane all testified regarding that point. There was also no testimony from any witness that any pharmacist ever

raised any issues with a specific Traub patient or that a specific Traub prescription should not have been filled based on any of the information included in the prescriptions which the pharmacists. This is especially compelling since the pharmacists maintained the gate-keeping and correspondent responsibility to ensure the validity of these prescriptions.

### Central Fill Agreement

Florida law specifically authorizes central fill agreements. Further, Florida law specifically permits the originating and central fill pharmacies to circumscribe the responsibilities and functions that each pharmacy will perform. *See* Florida Statute Sections 465.003(16); 465.025. In fact, pursuant to such an agreement, a pharmacy may delegate the responsibility of "adjudicating claims" (i.e. billing) to another pharmacy. Such a practice is entirely lawful and there has been no testimony from any witness that any such practice is contrary to any law. Therefore, although the government introduced evidence indicating that a central fill agreement cannot simply encompass billing through another pharmacy, this is not an accurate statement of the law. Florida Statute Section 465.003(16) states:

> "Centralized prescription filling" means the filling of a prescription by one pharmacy upon request by another pharmacy to fill or refill the prescription. The term includes the performance by one pharmacy for another pharmacy of other pharmacy duties such as drug utilization review, therapeutic drug utilization review, ***claims adjudication***, and the obtaining of refill authorizations.

**Mark Searles incident**

There was no evidence at trial that Mark Searles told Mr. Fisher that Dr. Traub was not his doctor or that he had never communicated with Dr. Traub. GX-8. Evidence at trial showed that Doran Fortune was a patient recruiter that had recruited patients for Scott Burton.

Evidence at trial showed that Doran and/or Scott Burton had altered the demographic sheets for 4 patients to include a Georgia address. One of those patients was a Florida patient which could have been filed at PSP. AF-201 and 201a.

There was also no evidence at trial as to what Mr. Fisher did or did not do with respect to those prescriptions once Vicki Cowart sent the email. GX-8. In the same email though, it indicates that the patient address was verified with the patient through the patient care specialists. Further, there is no evidence that Mr. Fisher did not *reverse* the claim or attempt to reverse the claim on the Mark Searles prescription.

Lastly, there was evidence that the law firm Galloway and Johnson had prepared letters for an ESI audit in connection with Burklow pharmacy and had provided them to Mr. Fisher so that doctors, including Dr. Traub (and many others), could sign those letters. Mr. Burton testified that he believed that Dr.

Traub signed those letters and that the other doctors signed those letters. Day 2, Burton, 188-189.

In sum, there was no direct evidence that Mr. Fisher willfully joined Mr. Burton's scheme based on the Mark Searles/Cowart email.

For these reasons, Mr. Fisher respectfully moves for a judgment of acquittal pursuant to Rule 29(a) on Counts 1-2.

                              Respectfully submitted,

                              s/John Beroset_____
                              BEROSET LAW FIRM
                              11 East Romana Street
                              Pensacola, Florida 32591
                              Email: john@berosetlawfirm.com
                              Florida Bar No. 657441

                              s/Andrew S. Feldman____
                              Feldman Firm PLLC
                              Southeast Financial Center
                              200 S. Biscayne Blvd, Suite 2770
                              Miami, Florida 33131
                              Office:        305.714.9474
                              Facsimile:   305.714.9555
                              Email:    afeldman@feldmanpllc.com
                              FBN:     60325

                              *Attorneys for Andrew Fisher*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this Motion was filed via CM/ECF on all counsel of record authorize to receive service.

By: s/ Andrew S. Feldman

ANDREW S. FELDMAN