UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,

v.  Case No.: 3:19cr76/MCR

ANDREW E. FISHER.
_____/

# ORDER

Following a jury trial, Defendant Andrew E. Fisher was found guilty of one count of conspiring to commit wire and health care fraud, and one count of conspiring to commit money laundering. Fisher's Presentence Investigation Report ("PSR") applies two upward adjustments to which he objects—an 18-level adjustment under U.S.S.G. § 2B1.1(b)(1)(J), based on a loss calculation of $6,262,947.57, and a 2-level adjustment under § 2S1.1(b)(2)(B), which accounts for the money laundering conspiracy.[1] *See* PSR, ECF No. 178 at ¶¶ 317-18, 334, 336. On consideration, the objections are sustained in part, overruled in part, and deferred in part.

## I. Legal Standard

All sentencing proceedings must begin with a correct calculation of the advisory Guidelines range. *Peugh v. United States*, 569 U.S. 530, 536 (2013). In

---

[1] Section 2B1.1(b)(1)(J) applies where the loss attributable to a defendant's offense is more than $3,500,000 but less than $9,500,000.

calculating this range, district courts are required by U.S.S.G. § 1B1.1 to first determine the base offense level, and then make appropriate upward or downward adjustments. *See also United States v. Booker*, 543 U.S. 220, 319 (2005). The Government bears the burden of establishing by a preponderance of the evidence the facts necessary to support an upward adjustment. *See United States v. Alberts*, 859 F.3d 979, 982 (11th Cir. 2017).[2]

## II. Loss Calculation, ¶¶ 317-18, 334

Fisher raises multiple objections to the loss calculation. First, he objects to the use of the intended loss amount as the basis for the loss calculation, rather than the actual losses to Tricare.[3] Second, Fisher maintains that the Court must determine when he gained knowledge that Dr. Traub was not seeing certain patients in order to assess loss in this case, and he asks the Court to consider the following "points" in making that determination: (1) Burton never testified that he told Fisher about any "specific identifiable patient" who received compounded prescriptions from Dr. Traub but was not seen by Dr. Traub; (2) the Government failed to prove that the claims submitted through Willow Pharmacy, Destrehan Pharmacy and Pharmacy Link to ESI/Tricare (totaling $1,019,190.01) are attributable to Fisher; (3) several

---

[2] Similarly, a defendant bears the burden of proving, by a preponderance of the evidence, the factual basis for an adjustment that would reduce the offense level. *United States v. Askew*, 193 F.3d 1181, 1183 n.3 (11th Cir. 1999).

[3] This objection is referenced in the PSR at ¶ 421; however, Fisher did not raise it in his briefing.

"fake" patients received compounded prescriptions for pain or scar creams that provided value to them (i.e., actually helped treat pain or scars), so the Court should exercise its discretion to reduce the loss figure for the claimed amounts for those patients; and (4) the Government's loss calculation improperly includes $673,448.79 in claims for legitimate Dr. Traub patients. Based on the foregoing, Fisher asks that the total loss be reduced by "at least $1,692,638.80 for a total of no more than $3,173,012.50," resulting in a 16-level upward adjustment under § 2B1.1(b)(1)(I).[4]

Fisher first argues that Tricare's actual loss, rather than the intended loss, should be used in calculating the loss attributable to his offenses. This is incorrect. "When calculating loss for sentencing purposes, the [d]istrict [c]ourt looks to the greater of actual loss or intended loss." *United States v. Willis*, 560 F.3d 1246, 1250 (11th Cir. 2009) (citing U.S.S.G. § 2B1.1(b)(1), n.3(A)). Intended loss is "the pecuniary harm that was intended to result from the offense" and it "includes intended pecuniary harm that would have been *impossible or unlikely* to occur." *Willis*, 560 F.3d at 1250 (citing U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A)). When a loss involves a government health care program, the "aggregate dollar amount of fraudulent bills submitted to the [g]overnment health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient

---

[4] Section 2B1.1(b)(1)(I) applies where the loss attributable to a defendant's offense is more than $1,500,000 but less than $3,500,000.

to establish the amount of the intended loss, if not rebutted." U.S.S.G. § 2B1.1, n.3(F)(viii).

In this case, the actual loss to Tricare was $4,865,651.30 and the intended loss (as currently calculated) is $6,262,947.57. Because the intended loss is greater than the actual loss, it was properly used in calculating the loss attributable to Fisher's offenses. To the extent the intended loss becomes less than the actual loss amount based on evidence presented at the sentencing hearing, the Court will revisit this ruling. For now, Fisher's objection to use of the intended loss calculation is overruled.

As to when Fisher learned that Dr. Traub was not seeing certain patients, sufficient evidence was presented at trial to establish it occurred in October or November 2014. Coconspirator Michael Scott Burton testified that, at that time, he told Fisher that he was looking for a pharmacy that would accept compounded prescriptions from Dr. Traub, who was willing to sign prescriptions without seeing the patients. According to Burton, Fisher responded that he had "no problem with it." Burton also testified that there were "many" other times that he and Fisher discussed "the fact that these prescriptions didn't have a real doctor/patient relationship behind them." This testimony establishes by a preponderance of the evidence that Fisher knew of, and agreed to participate in, the fraudulent scheme, beginning in October or November 2014.

Fisher's next two objections are interrelated. He argues that the Government failed to prove by a preponderance of the evidence that: (1) the fraudulent claims submitted through Willow Pharmacy, Destrehan Pharmacy, and Pharmacy Link to ESI/Tricare (totaling $1,019,190.01) are attributable to him; and (2) he knew precisely which specific prescriptions and patients were fraudulent. Both arguments fail.

"Participants in a conspiracy [may be held] responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010). In ascertaining the appropriate loss amount, a court must first make individualized findings concerning "the scope of the criminal activity the particular defendant agreed to jointly undertake." *See United States v. Baldwin*, 774 F.3d at 727 (citing *Mateos*, 623 F.3d at 1370). Then, the court may consider the conduct of co-conspirators "that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant." *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002). In determining the scope of "the criminal activity the particular defendant agreed to jointly undertake," the "court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Baldwin*, 774 F.3d at 727 (quoting *Petrie*, 302 F.3d at 1290).

Here, the scope of the criminal activity that Fisher agreed to jointly undertake was a scheme to defraud Tricare by submitting fraudulent compounded prescriptions for reimbursement and representing those prescriptions as signed by Dr. Traub for legitimate patients. It was reasonably foreseeable (and, indeed, was the entire object of the scheme to defraud) that fraudulent prescriptions would be billed through PSP during the relevant time period, even if Fisher did not know which particular prescriptions or patients were actually fraudulent. It was likewise reasonably foreseeable that Burton, a coconspirator engaged in fraudulent billing through Fisher's pharmacies, would also submit fraudulent prescriptions through other pharmacies in furtherance of the conspiracy to defraud Tricare, particularly since, according to Burton, he told Fisher that he was already submitting fraudulent bills through another pharmacy (Curant) when Fisher joined the conspiracy. Consequently, the intended losses for all fraudulent billing connected with the conspiracy—whether or not specifically identifiable to Fisher as fraudulent at the time, and including prescriptions submitted through Willow Pharmacy, Destrehan Pharmacy, and Pharmacy Link—are attributable to Fisher for purposes of his loss calculation under the Guidelines. *See Mateos*, 623 F.3d at 1371 (defendant responsible for entire intended loss from scheme to defraud Medicare even though she expressly consented to participate only in certain aspects of the scheme); *See United States v. McCrimmon*, 362 F.3d 725, 731-32 (11th Cir. 2004) (defendant

responsible for losses stemming from all reasonably foreseeable acts of coconspirators). Fisher's objections on these bases are overruled.

Fisher next asks the Court to exercise discretion to reduce the loss calculation by the prescription reimbursement amounts for "fake" patients of Dr. Traub who told law enforcement agents that the compounded prescription creams they received actually helped treat their pain and/or scars. A reduction on this basis is not warranted.

Generally, if a defendant "rendered any legitimate services to the victim before the fraud was detected, the loss amount must be reduced by the fair market value of . . . the services rendered." *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014) (citing U.S.S.G. § 2B1.1 cmt. n. 3(E)(i)). This "credit" accounts for the fact that "value may be rendered even amid fraudulent conduct." *Id*. That is not what happened here.

Here, the victim of Fisher and his coconspirators' health care fraud was Tricare. Tricare would not have reimbursed any compounded prescription that was not written in the context of a doctor-patient relationship, regardless of whether the Tricare beneficiary believed a particular prescription worked. Indeed, the efficacy of Fisher's compounded prescription products is irrelevant to the nature of the fraud perpetrated on Tricare. Moreover, there is no evidence in the record to show that the subject Tricare beneficiaries would have been prescribed or medically eligible to

receive compounded prescription creams if a doctor-patient relationship had actually existed with Dr. Traub or any other doctor. *See United States v. Ekpo*, 266 F. App'x 830, 834 (11th Cir. 2008) (affirming district court's refusal to apply credit to the loss amount for the value of the medical equipment that was distributed to Medicare beneficiaries where there was no evidence that defendant returned any of the money it received from Medicare for the fraudulent claims, and no evidence that the beneficiaries would have been medically eligible to receive the equipment absent defendant's fraud); *see also United States v. Emordi*, 959 F.3d 644, 652-53 (5th Cir. 2020) ("[B]ecause Medicare only pays for treatments that meet its standards, and services rendered by unlicensed personnel do not meet those standards, Medicare receives no value for those services."). In short, Fisher's compounding prescriptions services were not "legitimate" within the meaning of § 2B1.1—absent a true doctor-patient relationship, the prescriptions did not meet Tricare standards, Tricare would not have paid the claims but for the fraud, and Tricare received no value for the services. Accordingly, Fisher is not entitled to a credit for prescription reimbursement amounts in which "fake" patients were satisfied with the product.

Finally, Fisher claims that the Government's loss calculation improperly includes $673,448.79 in claims for legitimate Dr. Traub patients, which Fisher identifies in a spreadsheet attached to his brief as Exhibit B-1. In response, the Government, represents that the loss calculation reflected in the PSR is accurate and

has already been reduced by the prescriptions for legitimate Dr. Traub patients. The Court has confirmed with the United States Probation Office that legitimate Dr. Traub patients have been excluded from the loss calculation. To the extent Fisher believes there is evidence to the contrary, he should be prepared to submit that evidence for consideration at the sentencing hearing.

**III.     Section 2S1.1(b)(2)(B)**

Fisher also objects to the 2-level adjustment under U.S.S.G. § 2S1.1(b)(2)(B), which provides for an increase in the base offense level where a defendant was convicted under 18 U.S.C. § 1956. He argues that this adjustment should not be applied based on Application Note 3(C) of the commentary to U.S.S.G. § 2S1.1, which reads: "Subsection (b)(2)(B) shall not apply if the defendant was convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957." If the object of the defendant's conspiracy was an offense under § 1957, a one-level enhancement applies. *United States v. Ruan*, 966 F.3d 1101, 1173 (11th Cir. 2020) (citing U.S.S.G. § 2S1.1(b)(2)(A)). The Court agrees.

Here, the indictment charged, and Fisher was found guilty of, a conspiracy under 18 U.S.C. § 1956(h), the object of which was to launder proceeds from a

> conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Sections 1343, 1347, and 1349, as charged in Count One of [the] Indictment, all in violation of Title 18, United States Code, Section 1957.

*See* Indictment, ECF No. 1 at 11; Verdict Form, ECF No. 100. In other words, the object of Fisher's § 1956(h) conspiracy (as charged and adjudicated) was an offense set forth in § 1957. Consistent with binding precedent in the Eleventh Circuit, the one-level enhancement under U.S.S.G. § 2S1.1(b)(2)(A)—and not the two-level enhancement under U.S.S.G. § 2S1.1(b)(2)(B)—applies in this scenario. *See Ruan*, 966 F.3d at 1173-74.[5] Therefore, Fisher's objection to the § 2S1.1(b)(2)(B) adjustment is sustained.

## IV. Conclusion

Based on the foregoing, Fisher's objections to his offense level computation under the Guidelines range are **SUSTAINED IN PART, OVERRULED IN PART, and DEFERRED IN PART**, as follows:

   A.  Fisher's objection is **SUSTAINED** as to the two-level adjustment under § 2S1.1(b)(2)(B). Paragraph 336 of the PSR must be amended to replace the two-level adjustment with a one-level adjustment under § 2S1.1(b)(2)(A).

   B.  The Court **DEFERS RULING** on Fisher's objection regarding claims for legitimate Dr. Traub patients. Fisher may present evidence of legitimate Dr. Traub patients whose claims he believes should be

---

[5] In *Ruan*, the Eleventh Circuit held "the district court erred in applying the two-level sentencing enhancement under 2S1.1(b)(2)(B), and it should have applied the one-level enhancement under § 2S1.1(b)(2)(A)," where the defendant was convicted under 18 U.S.C. § 1957. *See* 966 F.3d at 1173. The error was deemed harmless and did not require reversal because applying the correct enhancement would not have changed the calculation of the defendant's Guideline range. *See id*. at 1174. But there was still error. And the Eleventh Circuit's published decision on the matter is still binding on this Court. *See McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) ("A circuit court's decision binds the district courts sitting within its jurisdiction.").

excluded from the loss calculation for the Court's consideration at the sentencing hearing.

C. Fisher's remaining offense level computation objections are **OVERRULED**.

**SO ORDERED**, on this 11th day of May, 2021.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**